# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 14, 2012      Decided June 25, 2013

No. 10-3074

UNITED STATES OF AMERICA,
APPELLEE

v.

JEROME HAMPTON, ALSO KNOWN AS JAY,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cr-00153-14)

*Christopher S. Rhee*, appointed by the court, argued the cause for appellant. With him on the briefs were *Isaac B. Rosenberg* and *Arthur Luk*.

*Suzanne Grealy Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.,* U.S. Attorney, and *Roy W. McLeese III*, *Mary B. McCord*, *John K. Han*, and *Anthony Scarpelli*, Assistant U.S. Attorneys. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

Before: BROWN, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Concurring opinion filed by *Circuit Judge* BROWN.

RANDOLPH, *Senior Circuit Judge*: A jury, after a retrial, convicted Jerome Hampton of conspiracy to distribute and to possess with intent to distribute phencyclidine (PCP). *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iv). The first trial, prosecuted against several alleged members of the conspiracy, ended in a mistrial for Hampton after the jury failed to reach a verdict with respect to him. Hampton argues that in his retrial the district court violated Rule 701 of the Federal Rules of Evidence when it permitted the FBI's administrative case agent to testify about his understanding of recorded conversations played for the jury.

The FBI recorded the conversations during its investigation of a D.C.-based drug ring led by Lonnell Glover. Glover's network distributed PCP Glover purchased from out-of-state suppliers through an intermediary, Velma Williams. Williams pleaded guilty before the first trial and testified for the government in that trial and in Hampton's retrial. The jury convicted Glover in the first trial. The government alleged that Glover paid Hampton to receive shipments of PCP at his place of business and that several shipments of the drug were delivered there. Williams testified that Hampton knowingly and willingly participated in Glover's drug operation by receiving packages shipped through FedEx and UPS.

FBI Agent Bevington was a key witness against Hampton at trial. The government did not attempt to qualify him as an expert witness under Rule 702 of the Federal Rules of Evidence. Instead, he was called as a lay witness. Agent Bevington testified that he had 20 years of FBI experience at the time of this trial, including more than 100 drug investigations and more

than 50 investigations with court-ordered wiretaps. With respect to Glover's drug operation, Bevington testified that he was the case agent—the supervisor of the FBI agents conducting the investigation. In that capacity, he monitored wiretaps, performed physical surveillance, provided daily reports to the United States Attorney's Office, and supervised other personnel monitoring the wiretaps. He also testified that he had reviewed every conversation—some 20,000—captured by the wiretaps, not just the 100 or so recordings admitted into evidence. The government put Bevington on the stand five times during the trial, usually to give the context and an explanation of recorded statements admitted into evidence. As the government told the jury during its opening statement, the recorded telephone calls were "very, very cryptic," and the government used Bevington to interpret them for the jury.

Federal Evidence Rule 701 permits lay testimony in the form of an opinion when it meets the following criteria: it must be rationally based on the witness's perception and helpful to the jury in understanding the witness's testimony or the determination of a "fact in issue," and may not be based on the kind of specialized knowledge possessed by experts within the scope of Rule 702.[1] We review the district court's admission of evidence for abuse of discretion. *United States v. Williams*, 212 F.3d 1305, 1308 (D.C. Cir. 2000).

When there has been a proper objection, the district court of course must determine whether the lay witness's opinion

---

[1] The full text of Rule 701 is as follows: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

testimony satisfies Rule 701's requirements. *See Williams*, 212 F.3d at 1309–10 & n.6; *see also* 29 CHARLES ALAN WRIGHT, KENNETH W. GRAHAM, JR., VICTOR JAMES GOLD & MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE §§ 6254, 6255 (1997 & Supp. 2013); Anne Bowen Poulin, *Experience-Based Opinion Testimony: Strengthening the Lay Opinion Rule*, 39 PEPP. L. REV. 551, 595–96, 610–11 & n.227, (2012).

Jurors too must independently assess the basis of the opinion and scrutinize the witness's reasoning. But "[w]hen a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find." *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992). Enforcement of Rule 701's criteria thus ensures that the jury has the information it needs to conduct an independent assessment of lay opinion testimony. Judicial scrutiny of a law-enforcement witness's purported basis for lay opinion is especially important because of the risk that the jury will defer to the officer's superior knowledge of the case and past experiences with similar crimes. *United States v. Grinage*, 390 F.3d 746, 750–51 (2d Cir. 2004).

Here, the district court's failure to enforce Rule 701's boundaries on lay-opinion testimony denied the jury the information it needed to assess the FBI agent's interpretations of recorded statements.

On several occasions the district court allowed Agent Bevington to provide opinions about the meaning of ambiguous references in recordings admitted into evidence. The prosecutor,

for example, played a tape in which Velma Williams asked Lonnell Glover: "[H]ave you talked [to] your brother? . . . [H]e say he feeling fine then?" The prosecutor then asked Agent Bevington to interpret the questions. When Agent Bevington opined that Williams was referring to Hampton, defense counsel objected, calling this mere speculation, and adding at the bench conference that Glover himself had a brother. In response to the court's question about the basis of Bevington's opinion, the prosecutor replied: "I think he has listened to all of the calls, and he's done the surveillance, and he has seen all of the evidence in this case, and he has based his opinion . . . on this investigation." Apparently convinced, the court overruled the objection.

That was only one of several such exchanges. After considering Hampton's objection that Agent Bevington's opinions about the meaning of certain terms used by the participants in the recordings were admissible only as expert testimony, the district court ruled that it would allow the testimony "because of the work here in this case where [Agent Bevington] has testified that he listened to thousands of conversations" recorded during the investigation.

The prosecutor asked Agent Bevington what he thought Glover meant when he said to Hampton during a phone call, "[s]o a boy come pick me up, then I had to ride around with him, when I see you I'm gonna tell you everything been going on, I just man you talking about a hectic [expletive deleted] day."[2] The court overruled Hampton's objection and explained, "I think that there is sufficient basis on the record with the

---

[2] Immediately before this statement, Glover mentioned his activities: he took his mother for treatment of an infection the previous day and stayed with her until 8 p.m., "then [he] had to run around" until midnight, he started getting calls at 6 a.m., and he took his truck—used in his hauling business—to the repair shop.

sequence and the contents of each of these phone calls, and Agent Bevington has experience in this case from reviewing all of the thousands of phone calls and understanding, so he can talk about his opinion as to what he believed they were discussing when he says that." The agent testified that he believed the statement indicated that Glover was planning to tell Hampton, when they met in person, that on the previous day police had executed a search warrant on the home of one of Glover's lieutenants and had seized PCP there.

On cross-examination, defense counsel challenged the basis for that opinion. The agent defended his testimony, stating, "There is more to it based on other activations on the phone and in the truck," and "it is based on other conversations." When asked if someone else could understand the statement differently, Agent Bevington replied, "If they just had this portion of the conversation and didn't know other things about the investigation and other conversations, maybe. But I think—anybody who has listened to all of the calls and is aware of all of the conversations would agree with me."

When an agent, particularly a case agent, *see United States v. Dukagjini*, 326 F.3d 45, 53–55 (2d Cir. 2003), provides interpretations of recorded conversations based on his "knowledge of the entire investigation," "the risk that he was testifying based upon information not before the jury, including hearsay, or at the least, that the jury would think he had knowledge beyond what was before them, is clear." *Grinage*, 390 F.3d at 750; *see also United States v. Garcia*, 413 F.3d 201, 213–15 (2d Cir. 2005). The *Grinage* court held that the agent's interpretation of conversations in that case was not a permissible lay opinion under Rule 701 "because, rather than being helpful to the jury, it usurped the jury's function." 390 F.3d at 751.

*Grinage* and this case are basically the same, with one important difference, a difference that highlights the error in admitting Agent Bevington's opinion testimony. In *Grinage* the government recorded 2000 telephone calls from the defendant's cellular phone. 390 F.3d at 747. Although the prosecution played only 13 of these calls for the jury, all 2000 were admitted into evidence. *Id.* at 747–48. Here there were approximately 20,000 recorded calls, but only 100 or so were admitted into evidence, and fewer still were played in court. And so when Bevington interpreted those conversations on the basis of his listening to "all of the calls," the jury had no way of verifying his inferences or of independently reaching its own interpretations.

We draw further support for our conclusion from cases discussing the government's use of summary or overview witnesses at trial, the analysis of which, we have noted, approaches the question presented here but from a different perspective. *See United States v. Moore*, 651 F.3d 30, 57 (D.C. Cir. 2011) (per curiam) (citing *Garcia*, 413 F.3d at 211–17); *see also Garcia*, 413 F.3d at 214–15; *United States v. Casas*, 356 F.3d 104, 117–20 (1st Cir. 2004). There is an overarching concern in that context with a witness using, as the basis for his opinion, evidence outside the record. "Such testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence." *Moore*, 651 F.3d at 57 (quoting *Casas*, 356 F.3d at 119–20) (brackets omitted).

These concerns also arise in cases addressing claims of prosecutorial misconduct for statements of opinion made during closing arguments. When a prosecutor gives his personal opinion on the credibility of witnesses or the defendant's guilt, the Supreme Court explained that "such comments can convey the impression that evidence not presented to the jury, but

known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *United States v. Young*, 470 U.S. 1, 18 (1985). "The prosecutor's opinion," the Supreme Court reasoned, "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 18–19. In nonetheless finding in that case that the remarks were not so harmful as to compromise the jury's deliberations, the Court noted that the prosecutor's statement "contained no suggestion that he was relying on information outside the evidence presented at trial." *Id.* at 19.

For all of these reasons, we agree with Hampton that the district court abused its discretion in allowing Agent Bevington's opinion testimony in violation of Rule 701.[3]

Contrary to the government's contentions, we cannot conclude that the errors were harmless. The government's evidence consisted largely of wiretap interceptions and recordings from a listening device. As a result, Agent Bevington's interpretations of conversations played a key role

---

[3] Agent Bevington was permitted to testify about the meaning of non-coded terms participants used in conversations. For instance, in the recorded conversation mentioned earlier, Glover told Hampton that "when I see you I'm gonna tell you everything been going on." Over a defense objection, Bevington stated that Glover meant he would tell Hampton about the seizure of PCP pursuant to a search warrant. Several courts of appeals have held that Rule 701 does not permit lay opinion testimony interpreting "clear statements," *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir. 1988), or "plain English words and phrases," *United States v. Peoples*, 250 F.3d 630, 640 (8th Cir. 2001). *But cf. United States v. Rollins*, 544 F.3d 820, 831–32 (7th Cir. 2008). Given our analysis we need not rely on this additional line of authority.

in the government's presentation to the jury. *See Grinage*, 390 F.3d at 751–52. Apart from the recorded conversations, the government's other major source of evidence was the testimony of Velma Williams. The jury had reasons to doubt her credibility and discount her testimony. Williams pleaded guilty to conspiracy under a deal with the government and hoped to benefit at sentencing by cooperating in Hampton's prosecution. When confronted with inconsistencies between her testimony and a note she had written about Hampton and Glover before pleading guilty, she cried on the stand.

The prosecution was unable to point to any money, drugs, weapons, or other evidence seized by law-enforcement personnel that could be tied to Hampton's alleged role in the conspiracy. There was never a wiretap on Hampton's phone. There were no witnesses who saw the contents of the packages shipped to Hampton's office park. Nor did the government ever seize those packages.

In light of the importance of Agent Bevington's opinion testimony to the government's case, the weakness of the government's other evidence, and the likelihood that the jurors afforded Bevington substantial authority because of his expertise and access to information unavailable to them, we cannot say "with fair assurance" that the error did not substantially affect the jury's verdict. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see Grinage*, 390 F.3d at 752.

Hampton also claims that some of Bevington's opinions, admitted as lay testimony, constituted expert testimony and thus should have been subject to the requirements of Federal Rule of Evidence 702. The agent gave his opinion on why drug traffickers use code when talking on the phone, based on his "experience of listening to wiretap interceptions." He also testified that "water" and "boat" mean PCP, and that in his

experience the term "dope" means heroin.  We have recently addressed this precise issue, *see United States v. Glover*, 681 F.3d 411, 422 (D.C. Cir. 2012); *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011), and find that these statements constituted expert testimony within the scope of Rule 702. Whether those particular errors—errors because Bevington was never qualified as an expert—were harmless is unnecessary to decide in light of our conclusion that Hampton's conviction must be vacated for the reasons stated above.

The judgment of conviction is vacated, and the matter is remanded for further proceedings.

*So ordered.*

BROWN, *Circuit Judge*, concurring: I agree that "when Bevington interpreted th[e] conversations on the basis of his listening to 'all of the calls,' the jury had no way of verifying his inferences or of independently reaching its own interpretations." Panel Op. 7. But as I see it, the problems do not end there. By testifying on numerous occasions on the meaning of ordinary—albeit cryptic—recorded language, Agent Bevington trespassed into the jury's domain.

Let's start with the sort of opinion testimony a witness may give in interpreting wiretapped conversations. An expert witness may interpret for a jury coded language generally used in drug conspiracies, much as a lay witness with personal knowledge of a particular drug conspiracy may testify on the meaning of coded language specific to that conspiracy. *See United States v. Wilson*, 605 F.3d 985, 1025–26 (D.C. Cir. 2010); *United States v. Rollins*, 544 F.3d 820, 830–32 (7th Cir. 2008). Yet neither category encompasses Agent Bevington's testimony on the wiretapped conversations in this case. Under the guise of lay opinion testimony, he explained the inferences the jury should draw from recorded conversations involving ordinary language. At that point, his testimony transformed from evidence into argument. *See United States v. Peoples*, 250 F.3d 630, 640–42 (8th Cir. 2001).

Take, for example, "Activation 100," a conversation between Lonnell Glover and Coolridge Bell, who was also indicted as a coconspirator:

| | |
|---|---|
| Glover: | Now I pay my man 5,000 for every time a 10 of those UI [unintelligible] come in? |
| Bell: | Huh? |
| Glover: | Every time 10 come in, I give him 5. |
| Bell: | UI. |

| | |
|---|---|
| Glover: | Naw to receive it. |
| Bell: | Oh UI. |
| Glover: | I pays everybody well man. That's what I'm saying there ain't no whole lot of room in this shit for me right. |
| | . . . . |
| Glover: | UI I give him 5, okay so he'll wind up making $25,000.00, just receiving and picking the shit up for me. |
| Bell: | UI. |
| Glover: | Alright and I'll take it and put it other places. I pay the peoples fucking bills you know what I'm saying? |

From this barely coherent exchange, Agent Bevington somehow divined that "Mr. Glover is talking to Coolridge Bell about paying Mr. Hampton for receiving shipments of PCP. . . . $5,000 every time ten gallons were received."

Consider also "Activation 5982," referenced in the opinion: "So a boy come pick me up, then I had to ride around with him, when I see you I'm gonna tell you everything been going on, I just man you talking about a hectic motherfucking day." Somehow, when passed through Agent Bevington's interpretive prism, this jumble of vagaries becomes crystal clear: Glover was "talking about Mr. Suggs coming to pick him up after he dropped his truck off in the shop, and he is going to tell Mr. Hampton what happened with the search warrant and everything related to that." That is not to say a juror could not have reached the same conclusions, but rather that such conclusions are fit only for a juror to reach.

As the panel recognizes, the reasoning in *United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004), readily applies to the facts of this case. Panel Op. 6–7. I fear, however, that based on our discussion, a casual reader may infer only one guiding principle from *Grinage*. In actuality, two may be distilled, and both apply here: First, the jury must not be deprived of the opportunity to independently evaluate the foundation for such testimony based on facts in evidence. *See* 390 F.3d at 750 ("Whether labeled as an expert or not, the risk that [the witness] was testifying based upon information not before the jury, including hearsay, or at the least, that the jury would think he had knowledge beyond what was before them, is clear."). Second, even if the testimony draws its inferences based only on facts in evidence, it may nonetheless impermissibly supplant the jury's factfinding role. A lay opinion witness may tell jurors "what was in the evidence," but not "tell them what inferences to draw from it," for that responsibility is up to the jury and the jury alone. *Id.* As the panel explained, "'rather than being helpful to the jury,'" such testimony "'usurp[s] the jury's function.'" Panel Op. 6 (quoting *Grinage*, 390 F.3d at 751).

Admitting Agent Bevington's testimony under Rule 701 was error. But just to be clear: had the government in this case placed into evidence the literally thousands of recorded conversations, the conclusion would be the same. Lambasting the jury with reams of additional evidence while still according magisterial status to Agent Bevington's inferences would do nothing to fix his intrusion on the factfinder's function.