# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 8, 2017      Decided October 10, 2017

No. 16-3011

UNITED STATES OF AMERICA,
APPELLEE

v.

ERNEST MILTON GLOVER, ALSO KNOWN AS FISH,
APPELLANT

———

Consolidated with 16-3019

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:07-cr-00152)

———

*Booth Marcus Ripke* argued the cause for appellant Helery Price. *Nicholas G. Madiou*, appointed by the court, argued the cause for appellant Ernest M. Glover. On the joint briefs were *Larry Allen Nathans*, appointed by the court, and *Michael Edward Lawlor*.

*Patricia A. Heffernan*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Elizabeth Trosman*, *Elizabeth H. Danello*, *Anthony Scarpelli*, and *Bernard J. Delia*, Assistant U.S. Attorneys.

Before: GARLAND, *Chief Judge*, WILKINS, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  Ernest Milton Glover and Helery Price here appeal the denial of their petitions to vacate their convictions under 28 U.S.C. § 2255.  Appellants were convicted of conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine, commonly known as "PCP," 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv), & 846, and were sentenced to the applicable statutory mandatory minimum of life imprisonment.

This Court has reviewed the underlying criminal prosecution on a few occasions, including Glover's and Price's direct appeal, *see United States v. Glover* ("*Direct Appeal*"), 681 F.3d 411 (D.C. Cir. 2012), and, most recently, an appeal from the denial of co-defendant Anthony Maurice Suggs's § 2255 habeas petition, *United States v. Suggs*, 688 F. App'x 17 (D.C. Cir. 2017).   The habeas petitions here present two issues upon which the District Court issued a Certificate of Appealability:  (1) whether counsel was ineffective for failing to challenge evidence obtained from an electronic surveillance device unlawfully installed in a vehicle outside of the authorizing court's geographic jurisdiction (the "Truck Bug"), and (2) whether counsel was ineffective for failing to object to specific instances of case agent John Bevington's testimony in which Bevington offered interpretations of evidence reflecting his knowledge of the investigation as a whole, which this Court rejected as contrary to Federal Rule of Evidence 701 in the appeal of a separate conviction arising out of the same conspiracy, *see United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013).

We conclude that counsel did not perform deficiently in failing to challenge the Truck Bug. In light of that, the evidence against Appellants was sufficiently strong that counsel's failure to object to specific instances of testimony by Bevington did not prejudice the defense, and we therefore affirm.

## BACKGROUND

Appellants were convicted in a jury trial that took place between February 11, 2008, and March 13, 2008. In addition to Price, also known as "Brother," and Glover, also known as "Fish" or "Ernie," targets of the investigation leading to this prosecution included Anthony "Applejack" or "Ap" Suggs, James Parker, Glendale Lee, Ernest Glover's brother Lonnell Glover, and Ernest Glover's relative Cornell "Tony" Glover,[1] among others. During the trial, FBI case agent John Bevington testified multiple times, describing the investigation and providing the foundation for the introduction of surveillance recordings from two authorizations: a bug installed in co-conspirator Lonnell Glover's truck and a wiretap of Suggs's cell phone.

The surveillance evidence from the Truck Bug made up a small, but important, part of the evidence against Glover and Price. The bug was authorized by Judge Collyer of the District Court for the District of Columbia. *United States v. Lonnell Glover*, 736 F.3d 509, 510 (D.C. Cir. 2013). The FBI affidavit in support of the warrant for the Truck Bug identified both Appellants by name as targets of the investigation. The affidavit stated that the truck was parked at BWI Airport, and that is where the agents installed the bug.

---

[1] We refer to Lonnell Glover and Cornell Glover by their full names to avoid confusion with Appellant Ernest Glover.

The prosecution introduced five recordings from the Truck Bug at Appellants' trial – three conversations between Lonnell Glover and Suggs and one conversation apiece between Lonnell Glover and two other associates. None of the Truck Bug recordings captured conversations with Appellants, but the interlocutors recorded by the Truck Bug discussed them. In Truck Activation 186, Suggs described to Lonnell Glover that "Ernie . . . had owed me, you know I was gonna get my paper from him" and had told Suggs "I might got half and owe you half." In Truck Activation 706, Lonnell Glover told Cornell "Tony" Glover that "Ap just got a 16 for Fish, that there is moving already," referring in slang to a quantity of PCP and to Ernest Glover by his nickname, "Fish." As to Price, Truck Activation 91 included a discussion in which Suggs told Lonnell Glover that he would put "[B]rother" "on hold till you get back," despite requests for "halves." Truck Activation 604 recorded Lonnell Glover and Suggs discussing whether to "give Brother the old water or the new water," to make sure that Brother's "regular people" were "satisfied happy." Suggs told Lonnell Glover that "Brother needs a gallon," repeating "Brother, I know what he want a gallon." This recording from the Truck Bug was a critical piece of evidence against Price, since his nickname is "Brother" and "water" is a slang term for PCP, and the prosecution used the phrase "Brother wants a gallon" in both the opening and closing arguments. Lonnell Glover and Suggs also discussed Ernest Glover in their conversation in Activation 604, with Lonnell saying that "Fish . . . got to get clean" and Suggs commenting on whether Ernest Glover was "owing somebody."

The prosecution also introduced approximately 80 calls from the Suggs cell phone wiretap, and the testimony about these recordings occupied a substantial part of the trial. In many of the calls, Appellants and their associates discussed getting together in the future or coordinating a

contemporaneous rendezvous. For example, in Activation 384, Price told Suggs "come and see me tomorrow. That be good . . . . I'll hit you tomorrow. Hit me tomorrow cause them peoples been pressing me for real. I just ain't get on top of it." In Activation 628, Price and Suggs reacted to viewing FBI surveillance vehicles when they were on their way to meet one another. They called off their meeting in apparent suspicion that they were being surveilled. *See* Trial Tr. 7:10-9:13 (Feb. 27, 2008, Afternoon Sess.). In other calls recorded by the Suggs wiretap, Appellants and their confederates discussed money. For instance, in Activation 2227, Suggs and Glover discussed money in terms like "tray," "deuce," and "piano." In Activation 5443, Price left a voicemail for Suggs, requesting that Suggs answer his phone and adding: "you don't like a moola or what?"

The prosecution utilized FBI case agent Bevington to introduce the recordings from the phone wiretap and the Truck Bug. Some of the recordings were introduced with minimal commentary, with Bevington simply providing the time and date information as foundation. *See, e.g.*, Trial Tr. 73:2-20 (Feb. 21, 2008, Morning Sess.). However, on other occasions, Bevington testified about the significance of the recorded communications. For example, after a line of recordings in which Price and Suggs discussed seemingly random items, Bevington testified that "book," "Sister Sister magazine," and "information" meant PCP, explaining that "[t]hey've changed the code multiple times. But they're clearly not talking about or using the same words to talk about what they're talking about." Trial Tr. 99:3-9 (Feb. 27, 2008, Morning Sess.). Interpreting a conversation in which Suggs informed Price that "we should have that apartment cleaned out one day this week then you can move in there," Bevington explained his view that the exchange was "Mr. Suggs letting Mr. Price know that he should have PCP for sale the following week" based on

Bevington's observation "during the course of the investigation [that] there was never any indication that Mr. Suggs was renting apartments or owned property." Trial Tr. 12:16-23 (Feb. 27, 2008, Morning Sess.).

Other evidence against Appellants included significant physical evidence recovered when police searched Glover's residence, including $985 in cash, a dollar bill with a substance suspected to be heroin, and a digital scale from a bedroom where Glover's wallet was found. In the kitchen, police found baggies, including one baggie containing heroin. In a basement closet, police found shoeboxes full of small glass bottles, a turkey baster, objects similar to eyedroppers, funnels, a juice bottle with the odor of PCP, vanilla extract bottles with the odor of PCP, a rifle, a shotgun, and ammunition. The District Court found that the juice bottle contained 178.1 grams of PCP and the vanilla extract bottles contained 6.2 grams of PCP. The recovered items were compelling evidence against Glover in particular, as they connected Glover to the drugs and contextualized his conversations with Suggs and other co-conspirators. Except for the heroin and weapons, which were admitted only against Glover, this evidence also contributed to the case against Price.

In addition, by stipulation, the jury was told that Glover was previously convicted of unlawful distribution of PCP, based on six controlled purchases between April 25, 1994 and February 13, 1996. Trial Tr. 42:21-43:16 (Feb. 25, 2008, Morning Sess.). A search executed at Glover's residence pursuant to the investigation in Glover's previous case revealed seven bottles with trace amounts of PCP. *Id*. at 43:5-11. This stipulation, too, was admissible against Glover alone.

Further direct evidence relating more closely to other co-conspirators added to the case against Glover and Price. The

FBI investigation conducted two controlled buys of PCP – one from co-defendant James Parker on January 4, 2007, and one from Suggs on January 20, 2007. On three separate occasions, agents videotaped meetings between members of the PCP conspiracy. And law enforcement ultimately seized significant quantities of PCP and paraphernalia from the residences of various co-conspirators, including 7.7 kilograms of PCP from Suggs's residence.

The jury convicted Appellants based on this body of evidence, and Appellants were sentenced to the mandatory minimum of life imprisonment. This Court affirmed on direct appeal and described the evidence against Glover and Price as "extensive" and "voluminous." *Direct Appeal*, 681 F.3d at 417, 424.

Certain later developments in the cases of others affiliated with this conspiracy are relevant to the issues now before us.

After Appellants' direct appeal was decided, this Court decided the appeal of Jerome Hampton, another Lonnell Glover associate convicted in a separate trial. *United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013). Hampton challenged the testimony of Agent Bevington as impermissible lay opinion testimony based on Bevington's understanding of the investigation as a whole. The Court agreed, reasoning that "[w]hen Bevington interpreted those conversations on the basis of his listening to 'all of the calls,' the jury had no way of verifying his inferences or of independently reaching its own interpretations." *Id.* at 983. The Court noted the "weakness of the government's other evidence," including that there was no direct evidence tying Hampton to the drugs, and concluded that the error in admitting Bevington's opinion testimony was not harmless because of its "importance . . . to the government's case." *Id.* at 984.

In addition, Lonnell Glover's conviction in a separate trial was overturned on the basis that the warrant authorizing the Truck Bug was facially insufficient. The warrant stated that the FBI could install the device in the District of Columbia, the District of Maryland, or the Eastern District of Virginia, and they did so while the truck was parked in Maryland. *Lonnell Glover*, 736 F.3d at 510. This Court concluded that the warrant was unlawful because a judge can only authorize interception "within the territorial jurisdiction of the court *in which the judge is sitting*." *Id.* at 514 (emphasis in original) (quotation marks omitted). The Court held that the failure to preclude the Truck Bug evidence was plain error, noting that the prejudice was "indisputable" because "[t]he truck bug recordings were, in the words of the prosecuting attorney at trial, some of the 'most incriminating' and 'most powerful' evidence at trial, and there is a high likelihood that this evidence affected the outcome." *Id.* at 516. The Court remanded for a new trial. *Id.* at 517.

**LEGAL STANDARDS**

This Court reviews *de novo* a denial of an ineffective assistance of counsel claim. *United States v. Abney*, 812 F.3d 1079, 1087 (D.C. Cir. 2016). We measure effectiveness of counsel by the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). To show ineffective assistance of counsel, a defendant must show "that counsel's performance was deficient" such that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that "the deficient performance prejudiced the defense." *Strickland*, 446 U.S. at 687. Prejudice requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" – that is, the defendant must show "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court can deny an

ineffectiveness claim on either the deficiency or prejudice prong. *Id.* at 697.

"[T]he same standard applies with respect to claims of the ineffective assistance of appellate counsel." *Payne v. Stansberry*, 760 F.3d 10, 13 (D.C. Cir. 2014). This Court has recognized that "effective appellate advocacy often entails screening out weaker issues," and "a reasonable winnowing of weaker appellate claims" may include the "decision to forego" some claims. *Id.* at 13-14 (quotation marks omitted). Even where a claim would be subject to plain-error review, however, counsel may be ineffective for failing to raise an "issue [that] had a reasonable likelihood of success," absent a strategic justification for that decision. *Id.* at 14.

**DISCUSSION**

I.

Appellants argue that counsel was ineffective for failing to seek to suppress the recordings from the unlawfully installed Truck Bug. The Truck Bug was authorized pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* Congress provided that "[a]ny aggrieved person . . . may move to suppress the contents" of an "unlawfully intercepted" communication. 18 U.S.C. § 2518(10)(a)(i). Appellants' claim for suppression is based on Title III's provision that "'aggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Appellants argue that this term includes targets named in an application or order for surveillance, regardless of whether the surveillance actually captures said targets' communication, since a named target is "a person against whom the interception was directed," *id.* We need not resolve the question of Title III target standing

because the existence of an entrenched disagreement between jurisdictions itself answers the *Strickland* question before us: counsel was not ineffective for failing to raise a challenge of uncertain merit based on unsettled law.

The question of so-called "target" standing under Title III has been litigated since the law's enactment. In *Alderman v. United States*, a Fourth Amendment suppression case, the Supreme Court held that defendants lack standing to challenge a search of someone else, reasoning that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." 394 U.S. 165, 171-72 (1969). The Court remarked that legislatures could extend the Fourth Amendment exclusionary rule if they so desired, noting that:

> Congress has not done so. In its recent wiretapping and eavesdropping legislation, Congress has provided only that an "aggrieved person" may move to suppress the contents of a wire or oral communication intercepted in violation of the Act. Title III, Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 221 (18 U.S.C. § 2518(10)(a) (1964 ed., Supp. IV)). The Act's legislative history indicates that "aggrieved person," the limiting phrase currently found in Fed. Rule Crim. Proc. 41(e), should be construed in accordance with existent standing rules.

*Id*. at 175 n.9 (citing S. Rep. No. 1097, 90th Cong., 2d Sess., at 91, 106). A decade later in *Rakas v. Illinois*, the Supreme Court specifically declined to extend standing under the Fourth Amendment to the "target" of a search or seizure. 439 U.S. 128, 135 (1978). In so holding, the Court rejected an argument

that language in the pre-Title III case *Jones v. United States*, 362 U.S. 257 (1960), implied standing under the Fourth Amendment for "one against whom the search was directed." *Rakas*, 439 U.S. at 134-35. Some courts have understood this progression to undermine target standing under Title III. According to these courts, the "existent [Fourth Amendment] standing rules" that Congress incorporated when it enacted Title III included the rule, later clarified in *Rakas*, that those against whom surveillance is directed have no standing unless they were directly victimized by the Fourth Amendment violation. *See, e.g.*, *United States v. Cruz*, 594 F.2d 268, 273 (1st Cir. 1979) (stating that "[w]e have also addressed the question of who is an 'aggrieved person' under [Title III]" and citing a case discussing Fourth Amendment standing); *United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975) (reasoning that "[u]nder prestatutory fourth amendment law, one does not have standing to suppress an illegal wiretap unless his conversations were overheard or the conversations occurred on his premises").

But courts disagree. Among them, the Ninth Circuit has found standing under Title III where "[a defendant's] conversations were the target of the surveillance." *United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012). The Sixth Circuit has implied that being listed as a "Target Subject" on a wiretap application would confer standing as an "aggrieved person" under 18 U.S.C. § 2510(11). *United States v. Asker*, 676 F. App'x 447, 455 (6th Cir. 2017) (noting that in the conversations the defendant sought to suppress, "[defendant] was not a party. Nor was he a 'person against whom the interception was directed' . . . . [T]he government's wiretap application listed eight 'Target Subjects' for monitoring, none of whom were [defendant].")). Indeed, the District Court in this case surveyed the case law, as well as the legislative history of Title III, and suggested that the better reading of Title III allows

standing for surveillance targets. These courts recognize a gap where the Supreme Court in *Alderman* discussed in dicta, but did not describe, the Fourth Amendment standards that it attributed to Congress's enactment of Title III.

Critically, this Court has never itself directly decided whether targets of surveillance have standing as such under Title III's "aggrieved person" definition. In *United States v. Bellosi*, upon which Appellants rely in their reply, we discussed *Alderman*'s citation of the language in *Jones v. United States* referring to "one against whom surveillance was directed" as one of the Fourth Amendment standing principles with which Section 2510(11) was "consistent." 501 F.2d 833, 842 n.22 (D.C. Cir. 1974). But in that case, "the Government d[id] not allege before us that any of the appellees d[id] not fit within the statutory definition of an 'aggrieved person,'" making this discussion unnecessary for the outcome. *See id*. at 842. In *In re Evans*, witnesses before a grand jury sought disclosure of surveillance based on "their belief that wiretapping and electronic surveillance had been directed against them and that the grand jury's subpoenas and questions were the fruit of that wiretap." 452 F.2d 1239, 1242 (D.C. Cir. 1971). The issue was whether the parties' status as grand jury witnesses afforded standing for them to seek disclosure of surveillance, not whether that standing turned on the witnesses being "targets" instead of actual interceptees. In *United States v. Williams*, this Court stated that to have standing to challenge surveillance, "the accused must show that it was directed at Him, that the Government intercepted His conversations or that the wiretapped communications occurred at least partly on His premises." 580 F.2d 578, 583 (D.C. Cir. 1978). But this opinion did not explain what "directed at Him" means any more than the statute elucidates "person against whom the interception was directed." Nor did the Court state whether the defendants were listed targets of the surveillance, the essential

fact underlying Appellants' theory here. Finally, in *United States v. Scurry*, we did not reach the question of target standing under Title III, as the wiretaps at issue in that case were challenged by the owners of the tapped phones. *See* 821 F.3d 1, 6 (D.C. Cir. 2016).

As it has never been necessary for this Court to directly determine whether a person named as the target of a wiretap application or order is an "aggrieved person" under Section 2510(11) with standing to suppress evidence derived from the surveillance in question, such suggestions from our cases touching on this issue are mere dicta.

Our survey of the status of the law on target standing under Title III resolves the *Strickland* question before us. The inquiry for deficiency looks at performance "as of the time of counsel's conduct" and accordingly does not require counsel to propound vanguard arguments to meet the bare minimum required by the Sixth Amendment. *See Maryland v. Kulbicki*, 136 S. Ct. 2, 4 (2015) (holding that counsel is not "constitutionally required to predict" changes in law). Counsel may decide how to "dedicat[e] their time and focus" in preparing a defense, and courts cannot second-guess these priorities. *Id.* We note that there is no evidence in the record that counsel were ill-prepared or failed to research the law on this issue. Absent that, and in light of the deeply unsettled law on the question of standing, trial counsel did not perform below the constitutional standard in electing not to challenge the Truck Bug, and appellate counsel was similarly not deficient in declining to raise the issue on appeal.

We do not reach Appellants' purported prejudice with respect to the Truck Bug evidence because counsel was not deficient for failing to challenge it.

14

II.

The same cannot be said, however, for counsel's performance with respect to Agent Bevington's testimony. Given the state of the law, as well as the District Court's direction on the issue, counsel performed below the constitutional standard when they failed to challenge specific instances of Bevington's impermissible lay opinion testimony, at trial and on appeal.

In *Hampton*, we explained that consistent with Federal Rule of Evidence 701, a case agent may only testify about "interpretations" of recorded statements of defendants if he "identifie[s] the objective bases for his opinion" such that the jury can assess his testimony and that testimony is helpful to the jury, rather than merely "tell[ing] it in conclusory fashion what it should find." 718 F.3d at 981 (quotation marks omitted). Interpretations based on "knowledge of the entire investigation" are not permissible lay opinion testimony, since "the jury ha[s] no way of verifying his inferences or of independently reaching its own interpretations" of any recordings not before them. *Id*. at 983. Rule 701 accordingly requires both that the witness identify and the jury have access to the bases for the witness's opinion and that the witness refrain from merely directing the jury to draw certain inferences on those bases.

In this case, it is clear that counsel performed deficiently in failing to challenge lay opinion testimony by Bevington that violated Rule 701. Counsel initially objected to the testimony that Bevington was likely to offer before the witness took the stand, and the District Court directed counsel that it would be amenable to objections of that nature, should counsel object "line by line" to any problematic testimony. *See* Trial Tr. 8:20, 10:11-13 (Feb. 19, 2008, Afternoon Sess.). The District Court

explained its "inbred dislike of having a government agent trying to tell the jury what a tape means" and its underlying concern about "how [the case agent is] going to have a better sense that a hair dryer means drugs than I would . . . . If the jury doesn't listen to the tapes and agree with you, Officer Bevington isn't going to make one bit of difference." *Id*. at 10:1; 9:5-7; 12-13. Despite the District Court's direction, counsel did not renew the objection when Bevington testified about his interpretations of conversations recorded by the Truck Bug and wiretap. The District Court's instruction that such objections were necessary – and would likely be sustained – was clear, as was the requirement of Rule 701 on which the objections were based. While we explained this rule in the *Hampton* decision after Appellants' case was tried, counsel had every reason to revive their objections contemporaneously as directed during trial based on the plain strictures of the Federal Rules of Evidence. Prior to trial, the Advisory Committee Notes accompanying the 2000 Amendments already stated that "code word[]" opinions are not the proper subject of lay opinion testimony pursuant to Rule 701. *See* Fed. R. Evid. 701 Advisory Committee's Note to 2000 amendment. Thus, trial counsel was deficient for not raising the issue, and appellate counsel should have challenged this testimony on direct appeal.

Without objection from Appellants' counsel, Bevington testified several times about the meaning of certain words and phrases used by Appellants and their associates. Bevington told the jury his interpretation of terms like "Sister Sister Magazine" and "information" – commonplace terms that made little sense in the context of the group's conversations. The intended meaning of Appellants and their associates in these conversations was for the jury itself to determine, without the guiding directives of a government witness whose interpretation was based on the entirety of the investigation, information not available to jurors. Bevington's translations of

everyday discussions – like the references in Activation 2093 to an apartment being cleaned out – similarly explained for the jury what they properly should have been left to interpret for themselves.

Of course, not every explanation about terms used in the surveillance recordings was problematic. Experts may testify under Rule 702 about generic slang language with which a jury may not be familiar. In fact, in Appellants' direct appeal, this Court held that it was harmless error for the prosecution to present Bevington's testimony about the meaning of slang terms "such as 'water' (PCP), 'boat' (marijuana laced with PCP), '16th Street' (16 ounces), and '32nd Street' (32 ounces)" without first qualifying Bevington as an expert under Rule 702 because he would have so qualified as a result of his significant experience investigating drug crimes for the FBI. *See Direct Appeal*, 681 F.3d at 422. Bevington also described the use of cigarettes dipped in PCP to offer customers samples of the product to explain the discussion in Truck Activation 91, an acceptable line of expert testimony because it was based on specialized training and assisted the jury in understanding a tool of the drug trade with which it might not otherwise be familiar. Bevington's opinion testimony about generic slang terms was well within the scope of his expertise as a field agent with the FBI – which is why, on direct appeal, this Court concluded that any failure to qualify Bevington as an expert was harmless. *See id.* This testimony, and other unchallenged portions of Bevington's presentation, were appropriate parts of the Government's case against Appellants.

## III.

Having concluded that Appellants' counsel performed below the constitutional standard when they failed to renew their challenges to Bevington's lay opinion testimony, we now

consider whether Appellants were prejudiced by this deficiency. With Bevington's remaining permissible testimony, the Truck Bug evidence, and the significant evidence not challenged here, we have no doubt that the jury would have convicted Appellants even absent the problematic testimony by Bevington.

We note first that the uncontroverted recordings include many exchanges in which Glover and Price arranged to meet with Suggs. In call after call – which the District Court painstakingly inventoried in its consideration of Appellants' habeas petitions – Appellants made plans to get together with Suggs. The frequency of the meetings, and the single-minded emphasis on Appellants' need to receive something from Suggs, make these recordings strong circumstantial evidence that Appellants were engaged with Suggs in the distribution of unlawful substances. That Price and Suggs aborted a planned meeting when they suspected that they were being followed by law enforcement vehicles cements such an inference.

The Truck Bug evidence also carries significant weight in the case against Appellants. As described in the factual background above, the Truck Bug recordings submitted against both Glover and Price linked Appellants to specific exchanges. The Truck Bug evidence linked Glover to a 16-ounce quantity of PCP and Price to a gallon. For both Appellants, the Truck Bug evidence also demonstrated the exchange of money owed between Appellants and Lonnell Glover and Suggs. These connections provided significant circumstantial evidence of Appellants' involvement in the PCP conspiracy.

Finally, the pervasive physical evidence in the homes of the Glover associates linked the group to the PCP, as did the controlled buys conducted by law enforcement in the course of the investigation. For Glover in particular, the drugs and drug

paraphernalia recovered when his home was searched was compelling evidence against him.

In contrast, the weight of Bevington's inadmissible lay opinion testimony was minimal. Bevington's interpretations were primarily used to buttress the prosecution's argument that the vague, guarded terms sometimes used by Appellants and others in fact referenced PCP. But the many unchallenged conversations from the Suggs wiretap linked Appellants to their co-conspirators, and to Suggs in particular, and Truck Bug recordings had separately established the connection between Appellants and the drug trade, as did the controlled buys and physical evidence, including PCP, recovered from Appellants' constant associates.

Given the quantity of evidence against Appellants and the minimal impact of the testimony challenged here, we see no prejudice despite counsel's deficiency in failing to challenge the improper lay opinion testimony by Agent Bevington. Absent prejudice, there is no Sixth Amendment violation. *Strickland*, 466 U.S. at 691-92.

\*\*\*

For the foregoing reasons, we affirm.