BERZON, Circuit Judge,
concurring and dissenting:
I concur in the majority opinion except for Part III(B), concerning Officer Avery Thompson’s testimony as to the content of the defendants’ recorded telephone calls. As to Part 111(B), the majority’s holdings rest on United States v. Freeman (Kevin Freeman), 498 F.3d 893 (9th Cir.2007). Kevin Freeman, in my view, goes much too far in allowing lay officer testimony concerning recorded conversations. Other circuits are considerably stricter than Kevin Freeman in this regard. In my view, the other circuits are correct, and Kevin Freeman is wrong. Kevin Freeman should be revisited by an en banc court, perhaps in this case.
Even accepting Kevin Freeman as binding precedent for the present, I dissent. I would hold the trial' court plainly erred under Kevin Freeman in admitting some of Officer Thompson’s testimony, and that the error was prejudicial.
I.
Defendants challenge Officer Thompson’s testimony under Federal Rule of Evidence 701, which allows a lay witness to offer an opinion only if it is (a) “rationally based on the witness’s perception,” (b) *1224 “helpful to clearly understanding the witness’s testimony or to determining a fact in issue,” and (c) “not based on scientific, technical, or other specialized knowledge within the scope of’ expert testimony. Fed.R.Evid. 701. This Court broadly permits an officer to “interpret[ ] ... ambiguous conversations based upon his direct knowledge of the investigation.” Kevin Freeman, 498 F.3d at 904. That aspect of Kevin Freeman is, in my view, wrong, and it is, as the majority recognizes, inconsistent with the case law in several other circuits. See, e.g., United States v. Freeman (Marcus Freeman), 730 F.3d 590 (6th Cir.2013); United States v. Hampton, 718 F.3d 978 (D.C.Cir.2013); United States v. Johnson, 617 F.3d 286 (4th Cir.2010); United States v. Grinage, 390 F.3d 746 (2d Cir.2004); United States v. Peoples, 250 F.3d 630 (8th Cir.2001); see also Maj. Op. at 1208-09. The holding should be revisited by an en banc court.
A.
Kevin Freeman addressed whether a police officer may testify as both an expert witness concerning coded drug terms and as a lay witness concerning his general knowledge about the case. The Court expressed concern “that a ease agent who testifies as an expert receives ‘unmerited credibility’ for lay testimony,” Kevin Freeman, 498 F.3d at 903 (citation omitted), but held that “the use of case agents as both expert and lay witnesses is not so inherently suspect that it should be categorically prohibited,” id. at 904. In so holding, Kevin Freeman also discussed the scope of permissible lay opinion testimony by an officer regarding the content of a defendant’s recorded conversations. It is that portion of Kevin Freeman which the majority reaffirms, and on which it relies repeatedly in rejecting defendants’ challenges to Officer Thompson’s testimony.
In Kevin Freeman, the officer “offered interpretations of ambiguous conversations that did not consist of coded terms at all.” 498 F.3d at 902. For example,
[i]n several conversations, [the officer] interpreted ambiguous phrases such as “that,” “they,” and “one of them,” to refer to either money or cocaine. In another conversation, [he] interpreted [a eo-eonspirator]’s statement, “Man, it’s done already” to mean “he’s given the cocaine to Kevin Freeman and that he’s received his money for it.”
Id. Similarly, “during one recorded telephone call, [a co-conspirator] stated that he ‘touched bases with two of those.’” [The officer] testified, without offering an explanation, that this meant that [the speaker] was able to obtain two kilograms of cocaine. Id. at 900. “During another recorded telephone call, Freeman informed [a co-conspirator] that he wished to get off of the telephone while driving.... [The officer] testified that Freeman’s desire to get off of the telephone was motivated by a fear of being pulled over and arrested for the possession of cocaine.” Id.
The Court noted that “in these instances [the officer] ceased to apply his specialized knowledge of drug jargon and the drug trade and began to interpret ambiguous statements based on his general knowledge of the investigation.” Id. at 902. Kevin Freeman nonetheless held that most of the officer’s testimony met the requirements of Rule 701, because his “understanding of ambiguous phrases was based on ... several hours of intercepted conversations ... and other facts he learned during the investigation,” and the testimony “proved helpful to the jury in determining what [the defendant and his co-conspirators] were communicating during the recorded telephone calls.” Id. at 904-05. In the Court’s view, the officer’s testimony “did nothing more than offer *1225 one possible framework for understanding the conversation.” Id. at 902. The Court did not express any concern about whether the information that formed the basis of the officer’s testimony came from evidence that had not been presented to the jury.
B.
Other circuits have severely restricted the ability of officers to testify on the basis of information not before the jury. In Marcus Freeman, the Sixth Circuit held that an FBI agent’s testimony regarding the meaning of the defendant’s recorded conversations was improper lay opinion testimony under Rule 701. 730 F.3d at 596-99. The court noted that “there is a risk when an agent ‘provides interpretations of recorded conversations based on his knowledge of the entire investigation ... that he [is] testifying based upon information not before the jury, including hearsay, or at the least, that the jury [c]ould think he ha[s] knowledge beyond what [is] before them.’” Id. at 596 (citing First, Second, and D.C. Circuit opinions).
The agent in Marcus Freeman “repeatedly substantiated his responses and inferences with generic information and references to the investigation as a whole.” Id. But he “failed to explain the basis of his interpretations — what experience he had that the jurors themselves did not have — and therefore failed to lay a foundation under Rule 701.” Id. at 597. Although the agent testified that he had listened to approximately 23,000 recorded calls, the jury only heard a small number at trial. Id. at 597-99. The court was concerned that the jury, “left in the dark regarding the source of [the agent’s] information,” id. at 596, and with “no way of verifying his inferences or of independently assessing the logical steps he had taken,” id. at 597, “likely gave him the benefit of the doubt in this situation,” id. at 596. Marcus Freeman held such rootless testimony to be an impermissible usurpation of the jury’s function. Id.[1]
The D.C. Circuit reached a similar conclusion in Hampton, holding that an FBI agent improperly testified about his understanding of a defendant’s recorded conversations, where the jury had no way to “verify! ] his inferences or ... independently reaeh[] its own interpretations.” 718 F.3d at 982-83. In that case, the government acknowledged during its opening statement that “the recorded telephone calls were ‘very, very cryptic,’ ” and that the jury would need help from the agent “to interpret them.” Id. at 981. The agent then testified that he had “reviewed every conversation — -some 20,000 — captured by the wiretaps, not just the 100 or so recordings admitted into evidence,” and as a result he had a better understanding of what was being said than did the jury. Id. The court noted that under Rule 701, the “[j]urors too must independently assess the basis of the opinion and scrutinize the witness’s reasoning. But ‘[w]hen a witness has not identified the objective bases for his opinion, the proffered opinion ... does not help the jury but only tells it in conclusory fashion what it should find.’ ” Id. (quoting United States v. Rea, 958 F.2d 1206, 1216 (2d Cir.1992)).
In Grinage, the Second Circuit was likewise troubled by “the risk that [the case agent] was testifying based upon information not before the jury.” 390 F.3d at 750. As in Hampton and Marcus Freeman, the agent testified that he had listened to *1226 many more recorded conversations than would be played for the jury, and “some pertinent calls he listened to ‘upwards of 20 plus times.’ ” Id. at 748. He also repeatedly “told the jury that his interpretations were ‘based on [his] knowledge of the entire investigation.’ ” Id. at 748-49. In doing so, the court concluded, he “interpreted both the calls that the jury heard and the calls that the jury did not hear.” Id. at 750. Moreover, “the agent was presented to the jury with an aura of expertise and authority which increased the risk that the jury would be swayed by his testimony, rather than rely on its own interpretation of the calls.” Id. at 751. Accordingly, “his interpretations of the calls went beyond permissible lay opinion testimony under Rule 701(b) because, rather than being helpful to the jury, it usurped the jury’s function.” Id.
These eases well identify the dangers of allowing a police officer — who is not an ordinary lay person — to testify based on masses of information not described in any detail to the jury. When our circuit held in Kevin Freeman that an agent’s “interpret[ation of] ambiguous statements based on his general knowledge of the investigation” was permissible lay opinion testimony, it did not address these risks at all. 498 F.3d at 902.
The majority now reads Kevin Freeman as providing blanket approval for Officer Thompson’s lay opinion testimony, even though he failed to explain the basis for his opinions and often invoked, without any detail as to the source, his knowledge of evidence not presented at trial. That understanding — which may well be an accurate reading of Kevin Freeman — confirms that our case law has sanctioned a major breakdown in the limits properly placed on lay opinion testimony. The majority maintains otherwise, rejecting the holdings in cases such as Hampton, Grinage, and Marcus Freeman as inconsistent with Rule 701’s acceptance of lay opinion testimony. Not so.
For one thing, although the majority opinion professes confidence in the jury’s ability to “identify unreliable [lay] opinion testimony,” Maj. Op. at 1209, enabling case agents to opine on the basis of information not before the jury, without sharing that information, the majority deprives the jury of the information it would need to perform that critical function. How can the jury be expected to evaluate the reliability of lay opinion testimony when the “experience [the agent] ha[s] that the jurors themselves d[o] not have” is not identified for the jury? Marcus Freeman, 730 F.3d at 597. Of equal importance: when a case agent is not required to provide the factual basis for his testimony, the district court has no way of assessing whether he is “rely[ing] upon [or] conveying] inadmissible hearsay evidence” or other improper bases for lay opinion testimony. Kevin Freeman, 498 F.3d at 904. The majority’s holding thus undermines both the foundational gatekeeping role played by judge and the factfinding role of jury. Rule 701 does not contemplate such abdication.
Nor, contrary to the majority’s supposition, is what the majority permits here, relying on Kevin Freeman, in any way similar to a lay witness identifying a photograph based on past contacts with the individual, contacts outside the jury’s knowledge. See Maj. Op. at 1208-09. There are four reasons at least why this analogy does not work, and why the testimony in this case went far beyond the intended confines of the lay opinion rule, Rule 701.
First, we actually have no idea, nor did the jury or judge, whether Officer Thompson’s testimony was “rationally based on [his] perception^,]” Fed.R.Evid. 701(a), or instead on what he heard from others' — via *1227 reports, conversations, and so on — during the course of the investigation.
Second, Officer Thompson was not testifying to something of which he had knowledge that the jury did not. The jury itself heard the tapes, as well as information about the events constituting the crimes. Officer Thompson was instead telling the jury the meaning he ascribed to particular facts and conversations, rather than leaving that determination to the jury.
Third, a police officer is not an ordinary lay witness. He is associated directly with the prosecution, and is likely to be regarded as enjoying special authority or expertise, even if not testifying as an expert witness. His interpretation, when premised, as here, on asserted vast knowledge beyond the jury’s ken, is likely to be accorded more weight than that of the usual percipient witness whose ability to provide coherent testimony Rule 701 was meant to preserve.
Finally, Officer Thompson’s statements regarding the technologically improved means by which he listened to the tapes, see infra pp. 70-73, indicates that his testimony does not meet the third requirement of Rule 701 — that it “not [be] based on scientific, technical, or other specialized knowledge within the scope of Rule 702.” Fed.R.Evid. 701(c); see also United States v. Finley, 301 F.3d 1000, 1007 (9th Cir.2002) (identifying, as a requirement of Rule 702, that “the subject matter at issue must be beyond the common knowledge of the average layman”). Perception using specialized equipment is not the sort of lay opinion at which Rule 701 is directed. A professional photographer who was able to identify an individual in a photograph only after amplifying the details through the use of specialized equipment would not be giving lay opinion testimony, even though he was in the end reporting his own (amplified) perceptions.
C.
This case illustrates the pitfalls of a regime in which officers are permitted to testify as lay witnesses on the basis of information derived from the investigation as a whole, not all of which is before the jury, using specialized equipment and methodologies not available to the jury.[2]
All parties acknowledge the recordings were of poor quality. Officer Thompson began his testimony by “let[ting] the jury know” that “sometimes the jail phone calls are kind of hard to ... hear” and “sometimes it might be a little bit hard to understand.” “[Sjometimes they’re just fuzzy,” and “the volume’s not so good on them.” The prosecution asked whether Officer Thompson could “direct us to what [he] w[as] hearing” “[i]f it’s not a real clear— when we try to play it over the system.” And throughout the trial, because the statements were not always “clear on the recording” the prosecution often asked Officer Thompson what particular participants were “saying here?”
Officer Thompson also repeatedly vouched for his understanding of the recordings because he had “a better way of listening to” them than the jury. Specifically, Officer Thompson told the jury that prior to the trial he listened to the record *1228 ings “a lot of the times, ... pushing the headphones into my ears, and slowing some of the phone calls down.” In addition to having been able to “control ... the phone calls” by “play[ing] it back three seconds and listen[ing] to it again,” Officer Thompson was also able to “sit down [in] a super — super-quiet room” when listening to the recordings. As a result, Officer Thompson “was confident [he] was hearing it correctly” and “in [his] notes,” which he referenced repeatedly during trial, he “tried as best as possible to write down accurate statements.” Officer Thompson thus affirmed his ability to “translate” the calls if the jury was unable to hear them clearly.
In light of the poor quality of the recordings, Officer Thompson’s expressed confidence in his own “translation]” imbued him “with an aura of expertise and authority which increased the risk that the jury would be swayed by his testimony.” Grinage, 390 F.3d at 751. Although the court instructed the jury that the “[statements made on the phone calls are the evidence, not the discussion that counsel and witnesses have had,” the instruction was an ineffective cure when the jury was repeatedly reminded that it had a more limited ability to hear and understand the phone calls than did the witness. Cf. United States v. Robinson, 707 F.2d 872, 879 (6th Cir.1983) (holding that it was error to admit tapes portions of which were entirely inaudible because it caused the jury to rely too heavily on unreliable transcriptions of the recorded conversations).
The risk that the jury would improperly defer to Officer Thompson’s judgment was compounded by his repeated testimony that he listened to hundreds of hours of recordings to which the jury was not privy. He told the jury “just so everyone knows, there’s about 150 hours or so of jail phone call recordings.” Of those, he “probably listened to a total of 110, 120 of these ... tapes” and “tr[ied] to maintain notes of a lot of them.” The jury was then told that it would “[e]ertainly not” have to “listen to all ... 150 hours.” It would only be hearing a “[l]imited number of calls.” Throughout the trial, Officer Thompson was asked to provide his interpretation of the calls on the basis of the “investigation” as a whole, and he frequently invoked his knowledge of “all of the conversations!.]”
Thus, when the quality of a recording was poor, Officer Thompson told the jury that he could rely on his extensive knowledge of other recordings to ensure that he was translating the call properly. For example, when the prosecution noted that it “was having trouble hearing” a particular recording, and asked Officer Thompson to “clarify what we were hearing there[,]” Officer Thompson stated “I’ve listened to literally probably in excess of 100 hours of conversation, so I’ve got a pretty good grasp on being able to listen to this[J” before telling the jury what was being said.
Officer Thompson also directly testified about portions of the recordings that were not, in fact, played for the jury. For example, he testified that there is “a very short clip out of the same phone call,” in which Defendant Willie L. Wilson “says, ‘Yeah, they got my ring from the house.’ ” When the prosecutor attempted to correct Officer Thompson, suggesting that the clip may have said only “ ‘They got my ring[,]’” Officer Thompson responded “I think the clip actually was cut a little short.” He also testified regarding a portion of a conversation in which Wilson states that he is going to “exit[ ] the line for just a moment” to go and get his “paperwork,” including a police report. But the prosecutor decided “to move ahead to where Mr. Wilson is returning with the paperwork, rather than necessarily listen *1229 ing to him going and getting the paperwork.” Although the prosecutor’s decision to skip ahead is understandable to avoid having to listen to minutes of silence, the jury was asked to trust Officer Thompson that prior to placing the call on hold, Wilson stated that he was going to go get his legal paperwork.
As in Marcus Freeman, Officer Thompson “drew conclusions from the phone calls the jury heard as well as from ... other phone calls and ... evidence the jury had no access to. In doing so, he infringed upon the role of the jury to decide what to infer from the evidence, and instead told them what conclusions and inferences to draw.” 730 F.3d at 598. In light of Officer Thompson’s repeated invocation of recordings not in evidence “the jury was left to trust that he had some information— information unknown to them — that made him better situated to interpret the words used in the calls than they were.” Id at 597.
Notably, when questioned on cross-examination whether a particular phrase frequently used by Wilson “could be interpreted [in] any number of different ways,” Officer Thompson stated “I think out of context, it certainly could be. I think if you placed it in context with the prior statements and the statements made after that,” not all of which the jury had access to, “I think it certainly puts it into a better perspective.” This testimony was similar to that found troubling in Hampton, where an agent was asked if it was possible for someone else — the jury, perhaps — to understand a statement differently, and he responded “ ‘[i]f they just had this portion of the conversation and didn’t know other things about the investigation and other conversations, maybe. But I think — anybody who has listened to all of the calls and is aware of all of the conversations would agree with me.’ ” 718 F.3d at 982. As in Hampton, Officer Thompson’s suggestion that no other interpretation of the telephone calls would be correct when placed in context — context unavailable to the jury — created a serious “risk that the jury 'w[ould] defer to the officer’s superior knowledge of the case” and the recordings themselves. Id at 981.
The recordings’ poor quality, as well as the limited selection played, left the jury without “the information it need[ed] to conduct an independent assessment of lay opinion testimony.” Id Aside from vague references to “the investigation” as a whole, Officer Thompson “failed to explain the basis of his interpretations — what experience he had that the jurors themselves did not have — and therefore failed to lay a foundation under Rule 701.” Marcus Freeman, 730 F.3d at 597. In Grinage, all 2,000 recorded calls were admitted into evidence, even though only thirteen were played at trial. 390 F.3d at 747-48. When the officer in Grinage gave his opinion based on having “listened to all of’ the calls, id at 748, the jury was at least able to listen to the recordings that informed the officer’s testimony, if it so desired. Here, by contrast, none of the calls — not even the ones played during trial — were directly admitted into evidence.[3] Thus *1230 when Officer Thompson “interpreted those conversations on the basis of his listening to ‘all of the calls,’ the jury had no way of verifying his inferences or of independently assessing the logical steps he had taken.” Marcus Freeman, 730 F.3d at 597 (quoting Hampton, 718 F.3d at 983). It is understandable that “the jury, left in the dark regarding the source of [Officer Thompsonj’s information, [would] likely g[i]ve him the benefit of the doubt in this situation.” Id. at 596. But to allow the jury to so do is to sanction an abdication of the jury’s duty.
Kevin Freeman allows the jury’s critical factfinding role to be usurped by law enforcement testimony based on evidence not presented at trial. As other circuits have held, this procedure has no basis in the Federal Rules of Evidence, undermines trial by jury, and cannot be allowed.[4]
II.
Even under Kevin Freeman, the admission of some of Officer Thompson’s testimony was in error.
The bulk of Officer Thompson’s testimony appears to have involved interpretation of “not only code words but also common words used in common ways.” Marcus Freeman, 730 F.3d at 598. Kevin Free-mare held that an officer’s interpretation of statements “that were not encoded drug jargon, but instead were phrases that were more likely to be understood by the jurors without assistance” violates Rule 701. 498 F.3d at 900.
For example, Kevin Freeman held “not helpful to the jury,” id. at 905, the officer’s interpretation of one defendant’s “instruction] [to another] to speak with him later so that they ‘can get all the particulars,’” as being “a reference to the ‘details,’ ” id. at 900. Similarly, when one defendant asked another “how everything had turned out,” we held unhelpful the officer’s testimony that the defendant “was asking ... how did the ‘drug deal turn out, how did everything go?’ ” Id. This testimony was particularly troubling because it involved the case agent’s speculation as to whether the defendant was involved in a drug conspiracy, the precise issue the jury was required to decide. We noted in Kevin Freeman that the case agent’s “specialized knowledge of the particular language of drug traffickers did not give him carte blanche to testify as to the meaning of other words in recorded telephone calls without regard to reliability or relevance.” Id. at 904.
*1231 In this case, Officer Thompson translated phrases that were similarly “likely to be understood by the jurors without assistance.” Id. at 900. For example, much of Officer Thompson’s testimony appears to have involved simply repeating the words said on the recorded telephone calls, in case the jury “couldn’t hear it.” Other testimony consisted of Officer Thompson’s speculation as to the meaning of statements made up of clear terms. For example, during one of the calls, Wilson said something to the effect of “whoever, the Cl [ (confidential informant) ] is, it’s close.” When asked what Wilson meant by that, Officer Thompson stated he meant “close to them” physically, as opposed to “close to reality or close to actuality.” This testimony amounts to pure speculation on the part of Officer Thompson as to what Wilson meant when he said the Cl was “close.” Although Officer Thompson’s interpretation was a reasonable one, it was unhelpful to the jury, which had the same ability— and the responsibility — to interpret such ordinary language.
Similarly, in a recorded call the day after the altercation with Donny Pitka, Wilson is described as having said, “ Wou know, he’s the one that started this shit.’ ... ‘That time with Batman, that was him.’ ” Officer Thompson then explained to the jury that “Batman” is a nickname for alleged co-conspirator, Brandon Haynes. This testimony, which was derived directly from his knowledge of the investigation and was not within the jury’s own powers of reason, would be permissible under Kevin Freeman. 498 F.3d at 901-02 (approving testimony regarding coded drug jargon). Officer Thompson went on, however, to explain, “[i]t appears that [Wil-sonj’s referring back to the November incident, where Mr. Pitka was in fact ... the one who was setting up the purchase from Mr. Brandon Haynes.” This statement usurped the jury’s function, even under Kevin Freeman’s limited acknowledgment of that function. Once informed that Batman was, in fact, Brandon Haynes, the jury was more than capable of interpreting Wilson’s statement without -the assistance of Officer Thompson.
As Officer Thompson’s testimony consisted largely of “either speculation or repetition of already - clear statements,” its admission violated Rule 701 as interpreted by this court. Kevin Freeman, 498 F.3d at 905.
HI.
Although the district court’s error was plain, relief is not warranted unless the error “affected substantial rights” and “seriously affected the fairness, integrity, or public reputation of the judicial proceedings.” United States v. Vences, 169 F.3d 611, 613 (9th Cir.1999) (internal quotation marks and citation omitted). The requirement that an error “ ‘affect[ ] substantial rights’ ... in most cases ... means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings.” United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). On plain error review, the defendant “bears the burden of persuasion with respect to prejudice.” Id.
Wilson has met that burden only with respect to his conviction on Count 7 for retaliation against a witness in violation of 18 U.S.C. § 1513(b)(2). I therefore dissent only with respect to Count 7.
Section 1513(b)(2) punishes “[wjhoever knowingly engages in' any conduct and thereby causes bodily injury to another person ... with intent to retaliate against any person for ... information relating to the commission ... of a Federal offense ... given by a person to a law enforcement officer.... ” To convert a simple assault into a § 1513(b)(2) violation, therefore, the offense must have been committed with the specific intent *1232 to retaliate against a witness for providing information to law enforcement. See United States v. Maggitt, 784 F.2d 590, 593-94 (5th Cir.1986).
Officer Thompson’s “translation]” of and testimony regarding the recorded phone calls contained the only direct evidence of Wilson’s intent to retaliate against Pitka for providing information to law enforcement. Officer Thompson testified regarding a call between Wilson and his cousin, Gabriella Haynes, the day after the incident with Pitka. Officer Thompson testified that Wilson admitted to having hit “ ‘Donny’ ” because “ ‘he’s the one that started this shit.’ ” Officer Thompson testified about another call in which “Wilson [is] talking about how they put Mr. Pitka’s name ... in the paper[,]” meaning “the documents that went to the jail.” Officer Thompson also told the jury that Wilson stated in a call the morning of the assault that “[s]nitches can’t go into the hallways.” Added to Officer’s Thompson’s testimony about the informant being “close” and the reference to the “November incident,” his speculation and professed “translation]” of these “already clear statementsf,]” Kevin Freeman, 498 F.3d at 905, provided a direct link between the assault and Wilson’s intent to retaliate against Pitka for being a “[s]nitch[.]”
Aside from Officer Thompson’s testimony, the evidence of Wilson’s intent was minimal. Wilson was not present in the gym when Defendant Anthony Gadson and alleged co-conspirator Donte Edwards confronted Pitka about being a “snitch.” Edwards, who testified for the prosecution, never said that he shared with Wilson his suspicions that Pitka had been a confidential informant. Pitka himself testified that Wilson said nothing to him before, during, or after the alleged assault, and that Pitka did not know why he was attacked. Although Pitka testified that he later believed it was because the government “sen[t] paperwork in on me,” he provided no basis for his speculative conclusion. Without Officer Thompson’s prejudicial testimony, there is a “reasonable probability that the jury would not have convicted” Wilson on Count 7. United States v. Teague, 722 F.3d 1187, 1192-93 (9th Cir.2013).
Finally, there is no question that Officer Thompson’s testimony “seriously affected the fairness, integrity, or public reputation of the judicial proceedings.” Vences, 169 F.3d at 613 (internal quotation marks omitted). In “offer[ing] a narrative gloss ... consisting] almost entirely of [his] personal opinions of what the conversations meant[,]” Peoples, 250 F.3d at 640, Officer Thompson’s unhelpful testimony “usurped the function of the jury to decide what to infer from the content of the calls,” Grinage, 390 F.3d at 750. Nothing could be more central to the integrity of judicial proceedings than the right to have the jury — not the police or the prosecution — decide a defendant’s guilt or innocence. For these reasons, I dissent from Part III(B) of the majority opinion.

. As these quotes show, and contrary to the majority’s account, see Maj. Op. at 1209-10, Marcus Freeman’s primary concern was that the jury was not provided information as to the source of the officer's knowledge of the investigation, not that he did not have the requisite knowledge.

. It is important to note that unlike in prior cases challenging an officer’s interpretation of recorded conversations, the parties here have not provided this Court with any recording or transcript of the telephone calls at issue. The Court has only a transcript with the notation "(Audio played)” followed by Officer Thompson's testimony interpreting that audio. The majority thus relies entirely on Officer Thompson’s own testimony in holding that the recorded statements were "vague” and that Officer Thompson's opinions "would provide helpful context” for jury. Maj. Op. at 1210.

. It appears that the government failed to preserve excerpts of the recordings containing only those telephone calls, or portions thereof, that were actually played at trial. When the jury asked during deliberations to "review the recordings of all jail phone calls," the court played only the audio recording of the trial proceedings in which the telephone calls were played — essentially, a recording of a recording. The next morning, the jury asked if it could hear "the original telephone recordings, not the recordings of the playback?” — presumably because the trial recordings were even harder to hear than the original tapes. But because the government had failed to preserve the excerpts, and defense *1230 counsel expressed concern that if allowed access to the full recordings, the jury might inadvertently hear portions that were never played at the trial, the court agreed to tell the jury that "the originals were not submitted into evidence, can't be provided at this time."
Although I agree with defendants’ appellate argument that it would have been prudent for the district court to require the government to isolate the portions of the telephone calls played at trial and admit them into evidence, defendants forfeited any argument in this regard by consenting to the district court’s chosen solution.

. The majority opinion references six other circuits, which it says "allow officers to provide interpretations of recorded conversations based on their knowledge of the investigation, subject to various safeguards.” See Maj. Op. at 1207 n. 5. A careful review of the cases cited makes clear that they do not condone what happened here. See, e.g., United States v. Albertelli, 687 F.3d 439, 444-48 (1st Cir.2012) (approving officer’s testimony where it did not "rely on broad appeals to 'the totality of the investigation’ but instead usually pointed to sources of information”); United States v. Jayyousi, 657 F.3d 1085, 1102-03 (11th Cir.2011) (approving police officer’s testimony regarding the meaning of code words used in recorded telephone calls); United States v. Rollins, 544 F.3d 820, 830-33 (7th Cir.2008) (same).