IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2017

## STATE OF TENNESSEE v. MATTIE FLORENCE SWEENEY

**Appeal from the Criminal Court for Davidson County**
No. 2015-A-300     J. Randall Wyatt, Jr., Judge
_____

### No. M2016-02372-CCA-R3-CD
_____

Defendant, Mattie Florence Sweeney, was found guilty of gross neglect of an impaired adult as charged in Count One and guilty of neglect of an impaired adult in Count Two. The trial court merged the two convictions into a single conviction for gross neglect of an impaired adult, and sentenced Defendant to a term of five years "to serve." After the denial of a motion for new trial, Defendant initiated this appeal. On appeal, Defendant argues: (1) the trial court committed plain error by constructively amending the indictment during the jury charge; (2) the trial court erred by admitting testimony about the victim's driver's license record; (3) the trial court erred by admitting lay testimony about the victim's cough and the condition of his skin; (4) the trial court erred by admitting a photograph of the victim's buttocks into evidence; and (5) the evidence was insufficient to support the convictions. After a review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Dawn Deaner, District Public Defender, and Emma Rae Tennent (on appeal) and Jonathan Wing and Kathryn Hansel (at trial), Assistant District Public Defenders, for the appellant, Mattie Florence Sweeney.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Jude Santana, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On December 11, 2014, the police found the victim, John Sweeney, living in Defendant's apartment in deplorable conditions. The victim, who was Defendant's father, was in his late 80s. Subsequently, in January of 2015, Defendant was indicted by the Davidson County Grand Jury in a multi-count indictment with one count of abuse or gross neglect of an impaired adult in violation of Tennessee Code Annotated section 71-6-119 and two counts of abuse or neglect of an adult in violation of Tennessee Code Annotated section 71-6-117. Before trial, the State was allowed to amend the indictment to allege one count of gross neglect of an impaired adult and one count of neglect of an adult.

At trial, Officer Shedie Herbert of the Metropolitan Nashville Police Department testified that he was working as an officer assigned to the Metropolitan Housing and Development Agency Task Force. On December 11, 2014, he responded to Defendant's apartment on a matter unrelated to the victim. Officer Herbert was given consent to search the apartment by Defendant and, as part of his search, started to locate all of the people in the apartment. Defendant informed Officer Herbert that her "Dad" was upstairs. Officer Herbert went upstairs and tried to open what he thought was a closed bedroom door. According to Officer Herbert:

> The first thing I noted as I opened the door was that there was something leaning against the door and I had to push a little bit and drag it out. I noticed that there were two to three adult diapers that had been overfilled with feces and had dried by this point that they were leaning against the door. I also noted that the floor immediately in front of the door was matted with different layers of feces, all had dried at different rates . . . .

Officer Herbert peered into the room with white linoleum floors and saw a trail of footprints in the feces that led to two areas in the "mostly empty room." The room contained a small piece of furniture, a set of box springs, and a mattress with no bedframe. There was no bedding on the mattress. There was "another adult diaper in the middle of the floor" and "some food [o]n the floor that had started to turn color and there was a plate of uneaten food also on the box spring and mattress." The victim was lying on the bed with no covers. He was wearing a "dirty" white t-shirt and vest but "nothing" from the waist down besides an adult diaper that was "overflowing with feces in [the] groin area and up the sides." The victim's feet were "too swollen to walk on" and were "covered in feces." Additionally, the victim's toenails were so long that they "curled under his toes." His fingernails were also long and curled, and there was "dark matter" under the victim's fingernails that appeared to be feces.

When Officer Herbert approached the victim, who was very thin with an unkempt beard, "he sat up and his face lit up and he had a big smile on his face." He told the

officer that he "want[ed] to go to the hospital." The victim claimed that he had not had any medication in five months and that no one would "help" him. The victim was "trying to talk fast" and started to cough a "very deep phlegmy cough." The victim told Officer Herbert that he thought that he was "going to freeze to death." Officer Herbert explained that he was comfortable in the room only because he was wearing his winter coat. The victim was unable to stand on his own after trying to do so several times.

Officer Herbert called the Nashville Fire Department and emergency medical technicians. The victim was placed on a stretcher, wrapped with blankets, and taken via ambulance to the Veterans Administration Hospital in Nashville. The victim told medical personnel that he hurt "all over." Paramedic Rana Eldridge completed a report shortly after responding to the call and transporting the victim to the hospital. In the report, Ms. Eldridge noted the dried feces on the floor. She documented that the victim was wearing jeans over an adult diaper. According to the report, the victim informed her that he had not been out of the room for quite some time and had not seen a doctor even though he had requested to do so. Ms. Eldridge had no independent recollection of the events, relying solely on her report for her testimony.

Officer Herbert confirmed the victim's identity by looking up his driver's license. The license listed the victim's weight as 126 pounds. Officer Herbert visited the victim at the hospital to take photographs of his condition. The photographs were admitted into evidence at trial and showed the victim's long, overgrown fingernails which had dark matter under them as well as the victim's swollen feet and long toenails. Officer Herbert also took a photograph of the victim's buttocks to highlight a spot just above the rectum that appeared "scaly and dark" and did not appear to "be healthy skin."

When the victim arrived at the hospital for treatment, he was assisted by Nurse Emily Johnson in the emergency room. At trial, she described the victim as lucid and oriented but that he appeared "emaciated" and "dirty." He weighed 102 pounds. She observed "fecal matter underneath his fingernails" which appeared "long like they had not been clipped, cleaned, [or] taken care of" in an extended period of time. Ms. Johnson described the victim's toenails in a similar manner and observed fecal matter on the victim's feet. The victim had fluid in his lungs, a below-normal body temperature, and slightly elevated blood pressure as well as a stage one bed sore on his buttocks. His medical diagnoses included malnutrition, dehydration, failure to thrive, E. coli bacterium, and inhalation E.coli pneumonia. Ms. Johnson explained that E. coli pneumonia can be contracted by "not being clean" and "inhaling" particles of fecal matter. E. coli bacterium occurs when the bacteria gets into the bloodstream. She considered both to be "very dangerous [medical conditions], especially [for] someone [the victim's] age and in his state of health to begin with." The victim was treated for the pneumonia after he left the emergency room.

Ms. Johnson was surprised to learn that the victim had been diagnosed with dementia and severe short term memory impairment. The victim told Ms. Johnson that "they" were not taking care of him at home. Specifically, he claimed that he was not being fed or given medication and that he had been lying on the floor for two days when the police found him. The victim suffered from dysphagia, or difficulty swallowing, and required supervision and/or assistance with eating. The victim claimed that his daughter gave him Ensure, a nutritional drink, at home and that he was not consistently fed actual food. The victim's medications had not been filled for several months.

The defense called Deborah Prieto, a certified nurse assistant who worked with the victim in November 2013, one year prior to the incident at issue. At that time, the victim was living with his step-daughter Markesha.[1] Ms. Prieto helped the victim bathe and walk. The victim's legs were "very weak" at that time and he was "unsteady" on his feet, but they would try to go for walks. The victim suffered from incontinence in November 2013 and had difficulty changing his adult diaper on his own. At the time, the victim weighed 106 pounds and subsisted "[b]asically [on] Ensure."

The victim's son, Phillip Sweeney,[2] had visited the victim in the summer of 2014 on approximately ten separate occasions. The victim was staying at Defendant's home. Phillip described his father as a proud man who was sometimes hesitant to ask for help. He last saw his father on Thanksgiving in 2014, approximately three weeks prior to this incident, at the home of his other sister, Patricia. Phillip described his father as "full of joy," and witnessed him walk, eat, and drink without assistance. The victim was wearing adult diapers at the time but was otherwise walking without assistance.

The victim's grandson, Jakorean Sweeney, was fifteen years old at the time of trial. Jakorean lived at Defendant's apartment when the victim was taken away in an ambulance. Jakorean remembered that the victim stayed at "Markesha['s] house" before coming to stay at Defendant's apartment. Jakorean helped to care for the victim by helping him take a bath, change his diaper, and dispose his diapers in the trash. Jakorean recalled that sometimes the victim would change his own diaper and leave it by the door for someone to take out to the trash. The victim was "walking" and would "be upstairs in his room and he w[ould] come downstairs sometimes." Jakorean claimed that Defendant, his mother, cooked three meals a day for the victim. According to Jakorean, the victim's bedroom was clean when the police came and there was no feces or soiled diapers on the

---

[1] Markesha's last name does not appear in the record. We mean no disrespect by referring to the victim's step-daughter by her first name.

[2] Because multiple witnesses have the same last name, we will refer to any witness with the last name Sweeney by their first name to attempt to maintain clarity. We mean no disrespect by referring to the witnesses by their first names.

floor. In fact, he claimed that the bed "had sheets on it every day." Jakorean also testified that the victim could walk but "walked slow" because he had pain in his legs.

Charline Pitt also lived at the apartment with Defendant and the victim. She referred to the victim as "daddy." Ms. Pitt explained that the victim did not live there all the time and had been there since shortly after Thanksgiving. Ms. Pitt recalled that everyone in the apartment helped to care for the victim by "washing clothes" and making sure the victim was eating. Ms. Pitt recalled that the victim was able to get around independently but that he moved slowly, coming downstairs to go outside and smoke or sit on the porch or on the couch. The victim had his own cell phone, a television, a few chairs, and baskets. The victim kept sheets on his bed until they were dirty, and he would throw them in the hallway for someone to wash.

The victim died on February 9, 2015. The jury was informed that his death was unrelated to the proof at trial. At the conclusion of the proof, the jury found Defendant guilty of one count of gross neglect of an impaired adult and one count of neglect of an impaired adult. The trial court merged the two counts and sentenced Defendant as a Range I offender to five years in incarceration for the conviction for gross neglect.

After the denial of a motion for new trial, Defendant initiated a timely appeal.

*Analysis*

*I. Constructive Amendment of the Indictment*

Defendant argues on appeal that the trial court committed plain error by constructively amending the indictment in its charge to the jury. Specifically, Defendant argues that the definition of neglect used by the trial court in the jury instructions incorporated the concept of abuse, which is not an element of the offense, thereby lowering the burden of proof for the State. The State insists that Defendant is not entitled to plain error review because the trial court did not breach a clear and unequivocal rule of law and, in any event, any error was harmless because there was no evidence presented that supported a conviction for abuse.

When Defendant was originally indicted, Count One alleged that Defendant had committed abuse or gross neglect. Counts Two and Three alleged abuse or neglect. Prior to trial, the trial court granted the State's motion to amend the indictment by consolidating Counts Two and Three into a single count that charged Defendant with neglect of the victim. The trial court also permitted amendment of Count One to charge gross neglect only, deleting all language referring to physical abuse of the victim. Thus, Count One in the amended indictment read as follows:

[B]etween the 1st day of June, 2014, and the 11th day of December, 2014, in Davidson County, Tennessee and before the finding of this indictment, [Defendant] knowingly, other than by accidental means, grossly neglect[ed] John Sweeney an impaired adult and the neglect resulted in serious mental or physical harm in violation of Tennessee Code Annotated § 71-6-119, and against the peace and dignity of the State of Tennessee.

Count Two of the amended indictment read:

[B]etween the 1st day of June, 2014, and the 11th day of December, 2014, in Davidson County, Tennessee and before the finding of this indictment, [Defendant] knowingly, other than by accidental means, did neglect, John Sweeney, an adult as defined in Tennessee Code Annotated section § 71-6-102, in violation of Tennessee Code Annotated § 71-6-117, and against the peace and dignity of the State of Tennessee.

During trial, after the close of the State's proof but prior to the conclusion of the defense proof, counsel for Defendant asked the trial court to force the State to elect "what actual conduct constitutes neglect as well as what constitutes the serious physical or mental harm." The trial court determined that because the State was proceeding on the theory of gross neglect only, it was not necessary to elect facts upon which the charge was based. This ultimately led to a discussion of the jury instructions. Specifically, during the discussion, the trial court read the definition of neglect as follows:

Neglect means the infliction of physical pain, injury or mental anguish or the deprivation of services by a caretaker that were necessary to maintain the health and welfare of the adult or a situation in which the adult was unable to provide or obtain services that were necessary to maintain that person's health or welfare, . . . .

The trial court continued:

[F]or you to find the defendant guilty of this offense, and we're talking neglect or gross neglect, it is not necessary that the alleged victim suffered bodily injury, which involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

That is the definition of serious bodily injury, so what this is saying is that you do not have to prove that, but it does go ahead in the pattern and say the law merely requires that the alleged victim suffer serious mental or

physical harm and then I look in the pattern instruction and there is really no definition for those two things [serious mental or physical harm], so my law clerk, me, and my secretary was looking at this and we have come up with a definition.

I want to see if you like or don't, probably you won't, or whether you have a suggestion, and the definition that we thought that makes sense in this is serious mental harm, means any serious impairment or the function of a person's mind. Seriously physical harm means any serious physical pain, illness or impairment of the body.

Counsel for the State was agreeable to the definitions of serious mental or physical harm proposed by the trial court, and counsel for Defendant said that the definition was "fine." There was no further discussion with regard to the definition of neglect. At the conclusion of the proof, the trial court instructed the jury that neglect was:

[T]he infliction of physical pain, injury, or mental anguish, or the deprivation of services by a caretaker that were necessary to maintain the health and welfare of the adult or a situation in which the adult was unable to provide or obtain the services that were necessary to maintain the person's health or welfare.[3]

Now, on appeal, Defendant complains that the trial court's definition of neglect includes and incorporates the definition and concept of abuse. Defendant points specifically to the following language in the definition of neglect, which he alleges actually defines abuse, "the infliction of physical pain, injury, or mental anguish." Defendant argues that "[t]he instruction given broadens the scope of the indictment and lowers the State's burden of proof . . . [and] constitutes a constructive amendment to the indictment."

We first note that Defendant did not raise this issue in her motion for new trial. Accordingly, we can review this issue only for plain error. *See* Tenn. R. App. P. 3(e). To determine whether a trial error rises to the level of "plain error," the following five factors must be present:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [did not waived] the issue for tactical reasons; and (e) consideration of the error [is] "necessary to do substantial justice."

---

[3] This instruction mirrors the language of Tennessee Code Annotated section 71-6-102(1)(A).

- 7 -

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).  All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.  *Id.* at 283.

The crime of which Defendant was convicted makes it "an offense to knowingly, other than by accidental means, physically abuse or grossly neglect an impaired adult if the abuse or neglect results in serious mental or physical harm."  T.C.A. § 71-6-119.  The State chose, prior to trial, to proceed on the theory of gross neglect rather than physical abuse.  The definitions in the statute and the pattern jury instruction for the offense define both abuse and neglect in the same instruction.  *See* T.C.A. § 71-6-102(1)(A); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 29.13.  The trial court herein took out the word "abuse," substituting the word "neglect" in its place.  Defendant insists that the trial court improperly included the first portion of the jury instruction (i.e. "the infliction of physical pain, injury, or mental anguish") that clearly pertains only to abuse, pointing to the comments after the pattern jury instruction to support his argument.  The comments after the pattern jury instruction suggest that:

> [t]he trial judge, after reading the definition of 'abuse or neglect' in T.C.A. § 71-6-102(1), and depending on the facts proved at trial, *may* wish to define 'abuse' separately as 'the infliction of physical pain, injury, or mental anguish' and 'neglect' separately as 'the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult, or a situation in which an adult is unable to provide or obtain the services that are necessary to maintain that person's health or welfare.'  Although those definitions would follow a common sense reading of the statute together with the common ordinary usage of the words 'abuse' and 'neglect,' the legislature failed to make that distinction.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 29.13.  While we acknowledge the existence of the comments to the pattern jury instructions, we recognize that they are not the law.  As our supreme court has previously noted, pattern jury instructions are only suggestions for a trial court because they are "not officially approved by [the Tennessee Supreme Court] or by the General Assembly and should be used only after careful analysis."  *State v. Hodges*, 944 S.W.2d 346, 354 (Tenn. 1997).  Therefore, the trial court did not breach a clear and unequivocal rule of law.  Moreover, the pattern jury instruction given by the trial court herein mirrors the definition of "abuse or neglect" found in Tennessee Code Annotated section 71-6-102(1)(A).  Defendant is not entitled to plain error relief.

*II. Evidentiary Issues*

## A. Admission of Driver's License Information

Defendant contends that the trial court committed error by allowing Officer Herbert to testify about the information on Defendant's driver's license, complaining that it was hearsay evidence. The State concedes that the admission of the evidence was error but argues that any error was harmless. We agree with the State.

Prior to trial, Defendant filed a motion in limine to exclude "[a]ny statement from [the victim's] driver's license, including his height, weight, or address." There does not appear to have been a pretrial ruling on the motion. At trial, Officer Herbert was asked if he had been able to identify the victim. Officer Herbert testified that he searched for the victim's driver's license record. Counsel for Defendant objected. The trial court overruled the objection and permitted the officer to testify that Defendant's driver's license listed his weight as 126 pounds and that the victim weighed 102 pounds at the hospital.

As a general rule, hearsay is inadmissible at trial unless otherwise provided by the rules or by law. Tenn. R. Evid. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A trial court's factual finding and credibility determination with regard to a hearsay statement is binding on this Court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). Whether a statement constitutes hearsay or satisfies a hearsay exception is a question of law which we review de novo. *Id.*

Ordinarily, a driver's license or report regarding driver's license history would be admissible as a public record under Tennessee Rule of Evidence 803(8). However, in this case, the driver's license itself was not tendered into evidence. Officer Herbert testified as to what he observed on the victim's driver's license to establish that the victim was well under his normal weight of 126 pounds at the time he was taken to the hospital.

We must determine whether the error was harmless. Non-structural constitutional errors do not require automatic reversal but are subject to a harmless error analysis. *State v. Allen*, 69 S.W.3d 181, 190 (Tenn. 2002); *see also State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989) (citing *Chapman v. California*, 386 U.S. 18 (1967)). Under the non-structural constitutional harmless error analysis, the defendant bears the burden of demonstrating "that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). The stronger the evidence of the defendant's guilt, the heavier the burden is on the defendant to prove that a non-constitutional error was not harmless. *Id.* However, harmless error analysis does depend

entirely on whether there was sufficient evidence to support a defendant's conviction. *Id.* Instead, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *Id.* The proper inquiry is whether the "error more probably than not had a substantial and injurious impact on the jury's decision-making." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

At trial, in addition to the improper testimony from Officer Herbert, the jury heard about the victim's weight from several other witnesses. Ms. Prieto testified that the victim weighed 106 pounds while in her care in November 2013, more than one year prior to the time he was found in Defendant's apartment. She described the victim as "emaciated." There was testimony that the victim lived at several locations between November 2013 and December 2014. Testimony from the nurse at the hospital showed that the victim was 102 pounds when he was brought in to the hospital, only four pounds less than what he weighed in November 2013. He was diagnosed as being malnourished. The jury could reasonably assume without the testimony from Officer Herbert that the victim was, at one time, heavier and healthier. Thus, any error in the admission of the hearsay testimony about the victim's stated weight on his driver's license is harmless.

### B. Admission of Officer Herbert's Opinion on the Victim's Condition

Defendant complains that the trial court improperly permitted Officer Herbert to give testimony that amounted to a medical opinion and conclusion regarding the victim's cough and the condition of the skin on his buttocks. The State disagrees, countering that the statements were permissible as lay opinion testimony under Tennessee Rule of Evidence 701.

Prior to trial, Defendant filed a motion in limine seeking to prevent non-medical witnesses from testifying about subjects that required medical expertise. The trial court granted the motion, commenting that "the police officer would [not] be testifying as an expert regarding medical diagnosis or whatever else it would be so he can testif[y] as a witness as to what he did in his investigation, but not get into medical evidence. . . ." At trial, during Officer Herbert's testimony, the trial court permitted the officer to testify as to his opinion on the victim's medical condition. Specifically, Officer Herbert testified that victim's cough was "so phlegmy" and was "a very rattily cough" that sounded "very serious." Counsel for Defendant objected to the testimony, but the trial court overruled the objection. Then, the officer testified that he was "not a medical professional" but that the skin above the victim's rectum was "scaly and dark" and did not appear "to be healthy skin." Again, counsel for Defendant objected, and the trial court overruled the objection.

To begin our analysis, we note that the admissibility of evidence is within the sound discretion of the trial court, and this Court will not interfere with the exercise of

that discretion in the absence of a clear showing of abuse appearing on the face of the record. *See State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993). When the admission or exclusion of opinion evidence is challenged on appeal, it is reviewable only for abuse of discretion. *See, e.g., State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997). An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence. *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Rule 701 of the Tennessee Rules of Evidence, entitled "Opinion Testimony by Lay Witnesses" provides as follows:

> (a) Generally. If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) rationally based on the perception of the witness and
>
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

The Tennessee rule is nearly identical to its federal counterpart. The Tennessee rule, as amended in 1996, reflects the trend in favor of allowing lay opinion testimony under certain circumstances:

> Although American law traditionally has treated lay opinion testimony as an unpopular relative who keeps appearing at family reunions, there is now a recognition that this relative not only should be invited to the gathering but may be a contributing part of the family. . . . The reason for this [trend in favor of allowing the admission of lay opinion testimony] is simple: sometimes lay opinion testimony is both necessary and valuable. The lay witness may not be able to provide helpful proof without giving an opinion. For example, how could a witness testify about age, identity, speed, or height without delving into the realm of opinion? What is helpful is the witness's total impression, not the constituent elements.

Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* § 7.01[3] (6th ed. 2011). Thus, a lay person may, as appropriate, testify as to his or her personal observation of a fact or event in the form of an opinion commonly understood by most people. *See State v. Wingard*, 891 S.W.2d 628, 636 (Tenn. Crim. App. 1994).

A witness's lay opinion testimony is admissible only when the jury could not readily draw its own conclusions on the issue without the witness's lay opinion or where the witness cannot effectively testify without stating the inference or opinion. *State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007). The lay opinion testimony should be based on admissible facts which are in evidence. *State v. Boggs*, 932 S.W.2d 467, 474 (Tenn. Crim. App. 1996). While expert opinion is based on a process of reasoning which can be mastered only by specialists in the field, lay opinion should be based on a process of reasoning drawn from everyday life. *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992). A lay opinion should be within the range of knowledge or understanding of ordinary laymen. *Boggs*, 932 S.W.2d at 474. In other words, opinions permissible under Rule 701 must be based on the witness's own observations, should require no expertise, and ought to be within the range of common experience. *State v. Samuel*, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007).

Common examples of lay witness testimony include: (1) testimony regarding the speed at which a car is traveling, *Kim v. Boucher*, 55 S.W.3d 551, 555-56 (Tenn. Ct. App. 2001); (2) testimony about whether a child was afraid, *Schiefelbein*, 230 S.W.3d at 130; (3) testimony about whether a person was physically impaired, *Boggs*, 932 S.W.2d at 474; (4) testimony about whether a person was intoxicated, *see Kirksey v. Overton Pub, Inc.*, 804 S.W.2d 68, 75 (Tenn. Ct. App. 1990); (5) testimony about whether an injury looked like a cigarette burn, *Brown*, 836 S.W.2d at 550; (6) testimony that an injury caused by digging a fingernail into the victim's skin was recent, *Samuel*, 243 S.W.3d at 603; and (7) testimony that a door looked like it had been pried open and that a footprint was similar to the defendant's, *State v. Anthony Duran Hines*, No. M2007-00493-CCA-R3-CD, 2008 WL 2026113, at *1-2 (Tenn. Crim. App. May 12, 2008), *perm. app. denied* (Tenn. Oct. 6, 2008). However, lay opinion testimony may be improper where the witness giving the lay opinion effectively usurps the function of the jury. *United States v. Grinage*, 390 F.3d 746, 750-51 (2d Cir. 2004) (holding that testimony interpreting both phone calls that the jury heard and calls the jury did not hear and making inferences highlighting similarities between the defendant's calls and others made in furtherance of a conspiracy was not permissible lay opinion testimony under Federal Rule of Evidence 701). Additionally, we note that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704.

In this case, Defense counsel sought to exclude the testimony of Officer Herbert about the victim's condition. Applying Rule 701, we can easily determine that the officer's proposed testimony certainly would be rationally based on his own perception of the victim. Officer Herbert was present during the search of the apartment where the victim was located and personally observed the conditions in which the victim was living. He saw and talked to the victim both prior to and after the victim's transportation to the hospital, hearing his cough in the process. Officer Herbert also observed the victim's

buttocks and observed the skin as scaly and dark. Officer Herbert qualified his opinion by noting that he was not a medical expert. The testimony provided by Officer Herbert in the form of his opinion testimony was certainly helpful to a clear understanding of the ultimate issue: whether the victim was grossly neglected by Defendant. While actual medical personnel testified as to the victim's condition when he was received at the hospital, Officer Herbert offered the only firsthand account of the victim's condition at the apartment. The testimony of Officer Herbert was "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *Schiefelbein*, 230 S.W.3d at 130. Consequently, the trial court did not abuse its discretion in admitting the testimony. Defendant is not entitled to relief.

### C. Admission of Photograph of the Victim's Buttocks

Defendant complains that the trial court improperly allowed the State to introduce a photograph of the victim's buttocks at trial. Specifically, Defendant argued in a motion in limine that the photograph was not relevant because it did not depict an injury or harm, was graphic, and had the potential to inflame the jury. The trial court permitted the introduction of the photograph. Defendant insists that the admission of the photograph was error. The State disagrees.

To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and their probative value is not outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Cmts). In

*Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider the following: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951. "Moreover, the admissibility of photographic evidence does not depend upon the defendant's offer to stipulate to the facts depicted therein." *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000).

Although the photograph in question is a close-up photograph of the victim's rectum and buttocks, and most likely uncomfortable for some people to view, we conclude that the trial court did not abuse its discretion in admitting the photograph. It was not overly prejudicial for the jury to see the extent of the victim's stage one bed sore and to hear an explanation of the bed sore from the nurse who examined the victim. The photograph was also probative to the determination of whether the victim was grossly neglected. Moreover, the photograph was merely one piece in the proof that Defendant committed the offenses. Therefore, we cannot conclude that the trial court abused its discretion by the admission of the photograph.

### III. Sufficiency of the Evidence

Lastly, Defendant argues that the evidence was insufficient to support the convictions. Specifically, Defendant argues that the State failed to establish that her actions resulted in serious mental or physical harm to her father. Additionally, Defendant insists that the State failed to establish knowing conduct on her part. The State contends that the evidence was sufficient to support the convictions.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own

"inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of gross neglect of an impaired adult in violation of Tennessee Code Annotated section 71-6-119. To sustain this conviction, the State must have proven (1) that the defendant knowingly, other than by accidental means, grossly neglected an impaired adult; and (2) that the gross neglect resulted in serious mental or physical harm. T.C.A. § 71-6-119. Additionally, the statute makes it clear that it is "not necessary for the [S]tate to prove the adult sustained serious bodily injury." *Id.* As stated above, neglect is defined in Tennessee Code Annotated section 71-6-102 as:

> the infliction of physical pain, injury, or mental anguish, or the deprivation of services by a caretaker that were necessary to maintain the health and welfare of the adult or a situation in which the adult was unable to provide or obtain the services that were necessary to maintain the person's health or welfare.

Viewing the evidence in a light most favorable to the State, the victim was staying at Defendant's home at the time that he was discovered by police. He was in a sparsely furnished, dirty, cold bedroom surrounded by soiled adult diapers, feces, and food that had been left out for an extended period of time. The victim was unable to walk and had extremely long fingernails and toenails which were caked with feces. Upon seeing Officer Herbert, the victim immediately told the officer that he needed to go the hospital because he was not getting his medicine. When the victim was taken to the hospital, he was found to be malnourished and was diagnosed with E. coli pneumonia and E. coli bacterium, both "very dangerous" for someone in the victim's condition.

Defendant complains on appeal that the testimony of Ms. Johnson as to the seriousness of the victim's condition was inadmissible because she was not qualified to render such an opinion. However, Defendant failed to object to this testimony at trial. In fact, Ms. Johnson testified as to her medical experience and Defendant did not challenge her testimony on cross-examination. Any attempt to do so now is waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Defendant also complains that the State failed to establish a causal relationship between the victim's diagnoses of E. coli bacterium and E. coli pneumonia with the fecal matter under the victim's fingernails. To the contrary, the evidence at trial showed that the victim was found in filthy conditions with dried feces both on the floor of the bedroom and under the victim's fingernails and toenails. Ms. Johnson testified that a person can inhale particles if they are exposed to them for an extended period of time.

Defendant also claims the State failed to prove that she acted knowingly. The proof showed that the victim had resided at Defendant's house in deplorable conditions for at least several days before he was found by the police and was suffering from two E. coli infections at the time he was taken to the hospital. There were several people living in the house that testified the victim was staying there and knew the victim needed assistance with daily activities. When the victim was taken to the hospital, he told medical personnel that he hurt "all over." There was proof from which the jury could determine Defendant was, by taking the victim under her roof, caring for and supervising the victim while knowing his condition and limitations and still failed to take proper action to care for his basic needs. We conclude that there was sufficient evidence from which a rational juror could determine that Defendant knowingly neglected the victim. The evidence was sufficient to support the convictions. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE